UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AIESHA INGRAM,                              CASE NO. 2:21-cv-10267

     *Plaintiff*,                          HON. DAVID M. LAWSON
*v.*                                        DISTRICT JUDGE

COMMISSIONER OF SOCIAL                      HON. PATRICIA T. MORRIS
SECURITY,                                   MAGISTRATE JUDGE

     *Defendant*.
_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 13, 14)

### I.   RECOMMENDATION

Plaintiff Aiesha Ingram challenges the Commissioner of Social Security regarding a final decision denying her claims for Social Security Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). The case was referred to the undersigned for review. (ECF No. 3); *see* 28 U.S.C. § 636(b)(1)(B) (2012); E.D. Mich. LR 72.1(b)(3). For the reasons below, I conclude that substantial evidence supports the Commissioner's decision. Accordingly, I recommend that the Court **DENY** Plaintiff's motion for summary judgment, (ECF No. 13), **GRANT** the Commissioner's motion, (ECF No. 14), and affirm the decision.

II.   <u>**REPORT**</u>

### A. Introduction and Procedural History

Plaintiff's applications for DIB and SSI were protectively filed on May 31, 2018. (ECF No. 11, at PageID.256, 263.)  She alleged that she became disabled on May 1, 2018. (*Id*. at PageID.256–58, 263.)  The Commissioner denied the claim on October 23, 2018. (*Id*. at PageID.208, 216.)  Plaintiff then requested a hearing before an administrative law judge ("ALJ"), which occurred on October 30, 2019.  (*Id*. at PageID.110, 224.)  The ALJ issued a decision on December 23, 2019, finding that Plaintiff was not disabled.  (*Id*. at PageID.49, 66.)   The Appeals Council denied review on December 2, 2020.   (*Id.* at PageID.42.)  Plaintiff then sought judicial review on February 5, 2021.  (ECF No. 1.)  The parties filed cross-motions for summary judgment and briefing is complete.  (ECF Nos. 13, 14.)

### B. Standard of Review

The Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g) (2012).  The District Court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x. 502, 506 (6th Cir. 2014) (internal quotation marks omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance."   *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).  "[T]he threshold for such evidentiary sufficiency is not high . . . . It means—and means only—'such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* at 286 (internal citations omitted).

### C. Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. § 1382c(a)(3)(A) (2012). The Commissioner's regulations provide that disability is determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

> (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.
>
> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.
>
> (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520 (2021); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The claimant must provide evidence establishing the residual functional capacity, which "is the most [the claimant] can still do despite [his or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1) (2021).

The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g) (2021)).

**D. ALJ Findings**

Following the five-step sequential analysis, the ALJ determined that Plaintiff was not disabled. (ECF No. 11, at PageID.66.)   At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since "May 1, 2018, the alleged onset date."  (*Id.* at PageID.54.)   At step two, the ALJ concluded that Plaintiff had the following severe impairments: "supraventricular tachycardia (SVT), hypertension, obesity, panic disorder without agoraphobia, and a mood disorder" that was "not otherwise specified."  (*Id.*)  None of these impairments met or medically equaled a listed impairment at step three.  (*Id.* at PageID.55–57.)   Next, the ALJ found that Plaintiff had the residual functional capacity ("RFC"):

> to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), except she can occasionally climb stairs or ramps, but can never climb ladders, ropes, or scaffolds.  She can occasionally balance, stoop, kneel, crouch, or crawl.  She must avoid hazards such as dangerous moving machinery and unprotected heights.  She is limited to understanding, remembering, and carrying out simple and routine tasks on a sustained basis.

(*Id.* at PageID.57.)   At step four, the ALJ found that Plaintiff could not perform her past relevant work as a warehouse worker, a hairstylist, or a production worker.  (*Id.* at PageID.64.)   Finally, at step five, the ALJ determined that Plaintiff could perform a significant number of jobs in the national economy, including, work as a "bench assembler," an "inspector," or a "packager."  (*Id.* at PageID.65.)   Accordingly, the ALJ concluded that Plaintiff was not disabled.  (*Id.* at PageID.66.)

### E. Administrative Record

#### i. Medical Evidence

Plaintiff has experienced anxiety and frequent episodes of tachycardia—an abnormally fast heart rate—for over a decade. (*Id.* at PageID.298, 709); *see* 20 C.F.R, Pt. 404, Subpt. P, App. 1, § 4.00(F)(1) (2021). In February 2017, Plaintiff sought treatment for hypertension, complaining of high "blood pressure, chest discomfort, fatigue," and heart "palpitations" after she attempted to "wean herself" off metoprolol, a medication used to treat high blood pressure and tachycardia. (ECF No. 11, PageID.58, 350–53); Sanjai Sinha, *Metoprolol*, Drugs.com, https://www.drugs.com/metoprolol.html (last updated Jul. 20, 2021). Plaintiff told her doctor that she had not fainted. (ECF No. 11, PageID.351.) Although Plaintiff's blood pressure was normal when tested, her physician noticed a heart murmur and recommended that Plaintiff continue taking metoprolol. (*Id.* at PageID.58, 353.)

Physicians monitored Plaintiff's heart for the following two months and discovered that Plaintiff's heart rate ranged from 70 to 130 beats per minute, on average. (*Id.* at PageID.58, 362.) For comparison, a regular heart rate ranges from 60 to 100 beats per minute; tachycardia describes a heart rate which surpasses 100 beats per minute. Supraventricular Tachycardia, Mayo Clinic (May 28, 2021), https://www.mayoclinic.org/diseases-conditions/supraventricular-tachycardia/symptoms-causes/syc-20355243. The next month, Plaintiff received a loop recorder which her physician used to continue monitoring her cardiac events. (ECF No. 11, PageID.695.) This

recorder later revealed that Plaintiff sometimes experienced heart rates up to 150 beats per minute.  (*Id.* at PageID.709.)

Plaintiff followed up with her physician in September 2017 and April 2018, both times reporting that her cardiac symptoms had continued despite taking metoprolol.  (*Id.* at PageID.514–17, 520–23.)  Indeed, at both visits, Plaintiff had an elevated blood pressure and a heart murmur.  (*Id.*)  Following her April 2018 appointment, her doctor prescribed Aldactone, a medication used to treat high blood pressure, and recommended that Plaintiff lose weight.  (*Id.* at PageID.517.)

Plaintiff's symptoms continued.  Between April 2018 and July 2019, Plaintiff checked herself into an emergency room numerous times, complaining of severe palpitations.  (*Id.* at PageID.748–78.)  However, Plaintiff only displayed a fast heart rate on one occasion, her heart rhythm was always normal, and she never reported fainting. (*See id.* at PageID.748, 751, 756–57, 759, 762, 764, 767, 770, 774.)  At each visit, Plaintiff's symptoms would resolve on their own or with the help of medication.  (*See id.*)

Plaintiff met with a physician twice more in July and August of 2019.  (*Id.* at PageID.60.)  This physician noted that Plaintiff had a history of tachycardia; however, her cardiac examination was normal on both occasions.  (*Id.* at PageID.670–71, 673.)  In October, Plaintiff met with a different physician who evaluated Plaintiff's loop recorder and concluded that Plaintiff "likely" experienced tachycardia.  (*Id.* at PageID.709.)  In addition to "conservative measures," such as losing weight and quitting tobacco, Plaintiff's

physician recommended that she either increase her dosage of medication, or undergo a surgical treatment called an "epicardial ablation."  (*Id.* at PageID.60, 713.)

### ii.    Plaintiff's Testimony at the Administrative Hearing

Plaintiff testified about her symptoms at an administrative hearing in October 2019. She explained that she suffered from depression and anxiety, which would exacerbate her cardiac symptoms.  (*Id.* at PageID.125, 140.)  Indeed, Plaintiff experienced episodes of tachycardia at random, which would cause her to panic.  (*Id.* at PageID.140–41.)  This would then cause her heart to beat even faster which would make her more anxious.  (*Id.*) Sometimes, Plaintiff could stop this snowball effect by practicing "breathing exercises" such as "blowing into "a brown paper bag."  (*Id.* at PageID.141.)

Plaintiff further testified that she visited the emergency room multiple times because of her cardiac symptoms.  (*Id.* at PageID.113.)  During these visits, concerned by Plaintiff's reports of tachycardia, doctors would monitor Plaintiff's heart with an EKG.  (*Id.*) However, Plaintiff's EKG results were always normal, notwithstanding one occasion where she exhibited a rapid heart rate.  (*See id.* at PageID.113, 757.)  Plaintiff did not mention that she ever lost consciousness before, or during, any of these visits.  (*See id.* at PageID.748, 751, 756–57, 759, 762, 764, 767, 770, 774.)  Instead, she testified that she was always "treated for anxiety" and sent home.  (*Id.* at PageID.113.)

Plaintiff testified that her tachycardia and anxiety have impacted her ability to live a normal life.  For example, Plaintiff was fired from one job after multiple episodes of tachycardia prevented her from arriving on time for her shifts.  (*Id.* at PageID.117.)

Plaintiff explained that she would often drive to work but would spontaneously experience an episode of tachycardia. (*Id.*) She would then pull over and perform breathing exercises until her heart rate returned to normal. (*Id.*) This caused Plaintiff to arrive late about five times in a single month, and to completely miss about four shifts in the same month. (*Id.* at PageID.116–17.)

Plaintiff eventually stopped driving altogether, fearing that her condition might cause an accident. (*Id.* at PageID.128.) She also explained that she could not stand in line at the grocery store without becoming "lightheaded." (*Id.* at PageID.138.) Rather than wait in line, Plaintiff testified that she would ask her daughter to hold her place in line while she finished shopping. (*Id.* at PageID.138–39.) Although Plaintiff testified at length about how her symptoms affected her daily life, she did not mention that her tachycardia ever caused her to faint.[1] (*Id.* at PageID.112–48.)

### F. Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B) (2012). The newly promulgated regulations, applicable to applications for disability benefits filed on or after the effective date of March 27, 2017, such as Plaintiff's application here, distinguish between acceptable medical sources, medical sources and nonmedical sources. An acceptable medical source means a medical source who is a:

---

[1] At the same hearing, a vocational expert testified about whether an individual in the same circumstances as Plaintiff could either perform Plaintiff's past work or find work in the national economy. Because Plaintiff only challenges the ALJ's step three findings, this testimony is not relevant to the issues presented to the Court.

(1)   Licensed physician (medical or osteopathic doctor);

(2)   Licensed Psychologist, which includes:

(i)   A licensed or certified psychologist at the independent practice level; or

(ii)   A licensed or certified school psychologist, or other licensed or certified individual with another title who performs the same function as a school psychologist in a school setting, for impairments of intellectual disability, learning disabilities, and borderline intellectual functioning only;

(3)   Licensed optometrist for impairments of visual disorders, or measurement of visual acuity and visual fields only, depending on the scope of practice in the State in which the optometrist practices;

(4)   Licensed podiatrist for impairments of the foot, or foot and ankle only, depending on whether the State in which the podiatrist practices permits the practice of podiatry on the foot only, or on the foot and ankle;

(5)   Qualified speech-language pathologist for speech or language impairments only. For this source, qualified means that the speech-language pathologist must be licensed by the State professional licensing agency, or be fully certified by the State education agency in the State in which he or she practices, or hold a Certificate of Clinical Competence in Speech-Language pathology from the American Speech-Language-Hearing Association;

(6)   Licensed audiologist for impairments of hearing loss, auditory processing disorders, and balance disorders within the licensed scope of practice only [];

(7)   Licensed Advanced Practice Registered Nurse, or other licensed advanced practice nurse with another title, for impairments within his or her licensed scope of practice []; or

(8)   Licensed Physician Assistant for impairments within his or her licensed scope of practice [].

20 C.F.R. § 404.1502(a) (2021).

A medical source is "an individual who is licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal law, or an individual who is certified by a State as a speech-language pathologist or a school psychologist and acting within the scope of practice permitted under State or Federal law." *Id.* § 404.1502(d).

In contrast, a nonmedical source means "a source of evidence who is not a medical source." *Id.* § 404.1502(e). "This includes, but is not limited to: (1) [the claimant]; (2) Educational personnel (for example, school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers); (3) Public and private social welfare agency personnel; and (4) Family members, caregivers, friends, neighbors, employers, and clergy." *Id.*

The Social Security Administration ("SSA") "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources." *Id.* § 404.1520c(a). "The most important factors we consider when we evaluate the persuasiveness of medical opinions and prior administrative medical findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section)." *Id.* The SSA will consider several factors when it contemplates "the medical opinion(s) and prior administrative medical findings" in a case. *Id.*

Of these factors, the first is "supportability." This factor considers that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical

finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be[.]" *Id.* § 404.1520c(c)(1).

The SSA will also consider the "consistency" of the claim. This includes the consideration that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be[.]" *Id.* § 404.1520c(c)(2).

In addition, the SSA will consider the "[r]elationship with claimant[.]" *Id.* § 404.1520c(c)(3). This factor will include the analysis of:

    (i)    Length of the treatment relationship. The length of time a medical source has treated you may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s);

    (ii)    Frequency of examinations. The frequency of your visits with the medical source may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s);

    (iii)    Purpose of the treatment relationship. The purpose for treatment you received from the medical source may help demonstrate the level of knowledge the medical source has of your impairment(s);

    (iv)    Extent of the treatment relationship. The kinds and extent of examinations and testing the medical source has performed or ordered from specialists or independent laboratories may help demonstrate the level of knowledge the medical source has of your impairment(s);

    (v)    Examining relationship. A medical source may have a better understanding of your impairment(s) if he or she examines you than if the medical source only reviews evidence in your folder[.]

*Id.* The fourth factor of the SSA's analysis is "specialization." In making this determination, the SSA will consider "[t]he medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to

become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion or prior administrative medical finding of a medical source who is not a specialist in the relevant area of specialty." *Id.* § 404.1520c(c)(4).

Finally, the SSA will consider "other factors." These may include any other factors that "tend to support or contradict a medical opinion or prior administrative medical finding." *Id.* § 404.1520c(c)(5). "This includes, but is not limited to, evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements." *Id.* Further, when the SSA considers "a medical source's familiarity with the other evidence in a claim, we will also consider whether new evidence we receive after the medical evidence source made his or her medical opinion or prior administrative medical finding makes the medical opinion or prior administrative medical finding more or less persuasive." *Id.*

As to the duty to articulate how persuasive the medical opinions and prior administrative medical findings are considered, the new regulations provide "articulation requirements." The ALJ will consider "source-level articulation." Pursuant to this requirement, "[b]ecause many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [he or she] considered all of the factors for all of the medical opinions and prior administrative medical findings in [each] case record." *Id.* § 404.1520c(b)(1).

"Instead, when a medical source provides multiple medical opinion(s) or prior administrative finding(s), [the ALJ] will articulate how [he or she] considered the medical

opinions or prior administrative findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate." *Id.* The regulation reiterates that the ALJ is "not required to articulate how [he or she] considered each medical opinion or prior administrative finding from one medical source individually." *Id.*

The regulations stress that the "factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be." *Id.* § 404.1520c(b)(2). As such, the SSA "will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record." *Id.*

When medical opinions or prior administrative findings are "equally persuasive," "well-supported" and "consistent with the record" "about the same issue," "but are not exactly the same, [the ALJ] will articulate how [he or she] considered the other most persuasive factors[] for those medical opinions or prior administrative medical findings in [the claimant's] determination or decision." *Id.* § 404.1520c(b)(3).

The regulations clarify that the SSA is "not required to articulate how we considered evidence from non-medical sources using the requirements of paragraphs (a) through (c) of this section." *Id.* § 404.1520c(d).

In addition, the regulations expressly state that the SSA will not consider "evidence that is inherently neither valuable nor persuasive" and "will not provide any analysis about how we considered such evidence in our determination or decision, even under § 404.1520c." *Id.* § 404.1520b(c). The regulations categorize evidence that is inherently neither valuable nor persuasive as: "[d]ecisions by other governmental and nongovernmental entities;" "[d]isability examiner findings," meaning, "[f]indings made by a State agency disability examiner made at a previous level of adjudication about a medical issue, vocational issue, or the ultimate issue about whether you are disabled;" and "[s]tatements on issues reserved to the Commissioner[;]" these statements include:

(i)     Statements that you are or are not disabled, blind, able to work, or able to perform regular or continuing work;

(ii)    Statements about whether or not your impairment(s) meets or medically equals any listing in the Listing of Impairments[];

(iii)   Statements about what your residual functional capacity is using our programmatic terms about the functional exertional levels [] instead of descriptions about your functional abilities and limitations[];

(iv)    Statements about whether or not your residual functional capacity prevents you from doing past relevant work[];

(v)     Statements that you do or do not meet the requirements of a medical-vocational rule[]; and

(vi)    Statements about whether or not your disability continues or ends when we conduct a continuing disability review[.]

*Id.* § 404.1520b(c).

The regulations also provide that "[b]ecause a decision by any other governmental and nongovernmental entity about whether you are disabled, blind, employable, or entitled to any benefits is based on its rules, it is not binding on us and is not our decision about whether you are disabled or blind under our rules." *Id.* § 404.1504. Therefore, the Commissioner "will not provide any analysis in our determination or decision about a decision made by any other governmental or nongovernmental entity about whether you are disabled, blind, employable, or entitled to benefits." *Id.* The Commissioner will, however, "consider all of the supporting evidence underlying the other governmental or nongovernmental entity's decision that we receive as evidence in your claim[.]" *Id.*

The regulations clarify that "[o]bjective medical evidence means signs, laboratory findings, or both." *Id.* § 404.1502(f). Signs are defined as "one or more anatomical, physiological, or psychological abnormalities that can be observed, apart from your statements (symptoms)." *Id.* Further, "[s]igns must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development or perception, and must also be shown by observable facts that can be medically described and evaluated." *Id.* § 404.1502(g). Laboratory findings "means one or more anatomical, physiological, or psychological phenomena that can be shown by the use of medically acceptable laboratory diagnostic techniques[,]" and "diagnostic techniques include chemical tests (such as blood tests), electrophysiological studies (such as electrocardiograms and electroencephalograms), medical imaging (such as x-rays), and psychological tests." *Id.* § 404.1502(c).

The most recent amendments to the regulations also tweaked the manner in which the SSA evaluates symptoms, including pain.  "In considering whether you are disabled, we will consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence.  We will consider all your statements about your symptoms, such as pain, and any description your medical sources or nonmedical sources may provide about how the symptoms affect your activities of daily living and your ability to work[.]"   *Id.* § 404.1529(a).

But the SSA clarified, "however, statements about your pain or other symptoms will not alone establish that you are disabled. There must be objective medical evidence from an acceptable medical source that shows you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and that, when considered with all of the other evidence (including statements about the intensity and persistence about your pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled."  *Id.* § 404.1529(a).

Further, "[i]n evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and laboratory findings, and statements about how your symptoms affect you."  *Id.* § 404.1529(a).  The SSA clarified that it will "then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can

reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work." *Id.*

Finally, the SSA noted that "[b]ecause symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, we will carefully consider any other information you may submit about your symptoms." *Id.* § 404.1529(c)(3).  This other information may include "[t]he information that your medical sources or nonmedical sources provide about your pain or other symptoms (e.g., what may precipitate or aggravate your symptoms, what medications, treatments or other methods you use to alleviate them, and how the symptoms may affect your pattern of daily living)," which "is also an important indicator of the intensity and persistence of your symptoms." *Id.*

"Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions that your medical sources or nonmedical sources report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account . . . .  We will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your medical sources, and observations by our employees and other persons[.]" *Id.*  The regulations establish that "[f]actors relevant to your symptoms, such as pain, which we will consider include []:

    (i)      [D]aily activities;

    (ii)     The location, duration, frequency, and intensity of . . . pain;

    (iii)    Precipitating and aggravating factors;

(iv)   The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

(v)    Treatment, other than medication, . . . received for relief of . . . pain;

(vi)   Any measures . . . used to relieve . . . pain.

*Id.*

The new regulations also impose a duty on the claimant: "In order to get benefits, you must follow treatment prescribed by your medical source(s) if this treatment is expected to restore your ability to work." *Id.* § 404.1530(a). Stated differently, "[i]f you do not follow the prescribed treatment without a good reason, we will not find you disabled or, if you are already receiving benefits, we will stop paying you benefits." *Id.* § 404.1530(b). Acceptable (or "good") reasons for failure to follow prescribed treatment include:

(1)    The specific medical treatment is contrary to the established teaching and tenets of your religion;

(2)    The prescribed treatment would be cataract surgery for one eye, when there is an impairment of the other eye resulting in a severe loss of vision and is not subject to improvement through treatment;

(3)    Surgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment;

(4)    The treatment because of its magnitude (e.g. open heart surgery), unusual nature (e.g., organ transplant), or other reason is very risky for you; or

(5)    The treatment involves amputation of an extremity, or major part of an extremity.

*Id.* § 404.1530(c).

### G. Arguments and Analysis

Plaintiff argues that the ALJ did not rely on substantial evidence in finding that that she did not meet listing 4.05, the listing for cardiac arrhythmia.[2]  *Id.* at § 4.05.  At step three, a claimant can show that he or she is disabled by meeting the elements of a listed impairment.  *Id.* § 404.1520(a)(4)(iii).  To meet a listing, claimants carry the burden of showing that they meet every element of a given listing.  *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).

Under listing 4.05, a claimant is disabled if, "despite medical treatment" he or she experiences "[r]ecurrent arrhythmias" that cause "uncontrolled" and "recurrent . . . episodes of cardiac syncope . . . ." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 4.05 (2021).  The claimant's arrhythmias must be "documented by [an EKG], or by other appropriate medically acceptable testing, *coincident with the occurrence of syncope or near syncope . . . .*" *Id.* (emphasis added).[3]  The Administration applies this regulation only where a claimant has "arrhythmias that are not fully controlled by medication, an implanted pacemaker, or an implanted cardiac defibrillator . . . ."  *Id.* § 4.00((F)(3)(a).

The ALJ found that Plaintiff did not meet the elements of listing 4.05 because she did not experience arrythmia despite "prescribed medical treatment."  (ECF No. 11, PageID.55.)  Specifically, the ALJ explained that although Plaintiff experienced "a

---

[2] "An arrhythmia is a change in the regular beat of the heart" where an individual's heart may seem to "beat irregularly," abnormally fast, or abnormally slow.  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 4.00(F)(1).
[3] Although not at issue, under listing 4.05, a claimant's arrhythmia may not be "related to reversible causes, such as electrolyte abnormalities or digitalis glycoside or antiarrhythmic drug toxicity . . . ."  *Id.*

significant number of episodes" where she "presented to the emergency department of a hospital with palpitations and an elevated heart rate," her "symptoms were always treatable" and "usually" responded well to "anti-hypertensive and/or anxiolytic medications." (*Id.*)  Likewise, the Commissioner argues that because Plaintiff's arrythmia could always be successfully treated in-hospital, she cannot meet listing 4.05.  (ECF No. 14, PageID.816–17.)

Plaintiff argues that the ALJ's interpretation of the phrase "prescribed treatment" is over-broad.  (ECF No. 13, PageID.800–04.)  Specifically, she notes that she regularly took medication to prevent arrythmia, but that despite this medication, she frequently experienced episodes of abnormally fast heart rates.  (*Id.* at 801–02.)  This, Plaintiff asserts, is all she must show to meet this element of the listing.[4]  (ECF No. 13, PageID.801–02.)

Plaintiff and the Commissioner essentially dispute the meaning of a "prescribed treatment" under listing 4.05.  Under Plaintiff's view, a prescribed treatment is one that a claimant receives as part of his or her regular course of treatment—the phrase does not encompass extraordinary circumstances, such as hospitalizations or emergency room visits.  (*See* ECF No. 15, PageID.820–21.)  The Commissioner reads this phrase more literally, arguing that any medical treatment a claimant receives, including hospitalization, constitutes a "prescribed treatment" under 4.05.  (*See* ECF No. 14, PageID.817.)

---

[4] Plaintiff also takes issue with the ALJ's conclusion, when discussing Plaintiff's RFC, that Plaintiff's arrythmia was caused by her anxiety.  (*Id.*)  However, the cause of a claimant's arrythmia is not relevant under listing 4.05, and there is no indication that the ALJ considered the cause of Plaintiff's arrythmia at step three.  (*See* ECF No. 11, PageID.55.)

Read in context with the surrounding regulations, prescribed treatments under 4.05 do not encompass extraordinary, emergency treatments; rather, they only refer to treatments that are regularly prescribed to a claimant to manage his or her symptoms. Section 4.00(A) provides general rules for each cardiac listing, including 4.05. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 4.00(A). In § 4.00(A)(2), when explaining how it evaluates cardiac impairments, the SSA explains that it considers a claimant's "response to a *regimen* of prescribed treatment," suggesting that the Administration considers, specifically, only treatment that is part of a "systemic" medical "plan." *Id.* § 4.00(A)(2) (emphasis added); *Regimen*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/regimen (last visited Jan. 19, 2022). By contrast, emergency treatment, like Plaintiff received here, is not part of a claimant's medical plan.

Similarly, in § 4.00(F)(3)(a), the regulations suggest that only treatment pursuant to a planned regimen can constitute a prescribed treatment under 4.05. Specifically, § 4.00(F)(3)(a) provides that the Administration will only consider an impairment under 4.05 if the claimant experiences an arrythmia that is "not fully controlled by medication, an implanted pacemaker, or an implanted cardiac defibrillator . . . ." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 4.00(F)(3)(a). Notably, each treatment listed in this section is one that is normally prescribed as part of a planned regimen to manage a patient's arrythmia—these are generally not emergency treatments. *See Heart Arrythmia*, Mayo Clinic, (Oct. 1, 2021), https://www.mayoclinic.org/diseases-conditions/heart-arrhythmia/diagnosis-treatment/drc-20350674; British Heart Foundation, *Drug Cabinet: Anti-Arrythmics*, Heart

Matters        Magazine,        https://www.bhf.org.uk/informationsupport/heart-matters-

magazine/medical/drug-cabinet/anti-arrhythmics, (last visited Jan. 1, 2019).

Moreover, § 4.00(F)(3)(A) requires that a claimant's arrythmia must be fully

"controlled," meaning that it responds "adequately" to "standard prescribed treatment."

*See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 4.00(A)(3)(f), (F)(3)(a).   In this context,

"standard" can be best understood to mean treatment of "an average or normal

requirement."                    *See*              *Standard*,              Dictionary.com,

https://www.dictionary.com/browse/standard (last visited Jan. 1, 2022).   But emergency

treatment is not standard, especially where, as here, the emergency treatment is provided

in addition to a regular course of medication.   Rather, standard treatments for arrythmia are

those, such as "medication, an implanted pacemaker, or an implanted cardiac defibrillator,"

which help an individual manage his or her symptoms to *avoid* medical emergencies.   *See*

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 4.00(F)(3)(a).

Under the Commissioner's interpretation, an individual who takes standard,

prescribed medication to manage his or her symptoms, but still experiences episodes of

arrythmia, would not qualify for benefits under this listing if he or she obtains emergency

medical care that successfully relieves his or her symptoms.   This interpretation is detached

from how arrythmias are commonly treated in practice.   Most arrythmias are treated

prophylactically—rather than rush to the hospital whenever symptoms arise, most

individuals utilize treatments that prevent or quickly resolve arrythmias.   *See Arrhythmia*,

Cleveland Clinic, https://my.clevelandclinic.org/health/diseases/16749-arrhythmia (last

visited Jan. 20, 2022).  In this context, the SSA almost certainly intended for listing 4.05 to apply to individuals who, despite taking standard treatments, cannot manage their symptoms.

At best, the Commissioner's interpretation would deny benefits to individuals with uncontrollable breakthroughs, and at worst, it could discourage claimants from seeking emergency treatment for fear of losing benefits.  I find it unlikely that the SSA intended this result.  *See O'Dainel v. Richardson*, 458 F.2d 330, 334 (6th Cir. 1972) (quoting *Haberman v. Finch*, 418 F.2d 664, 667 (2d Cir. 1969) ("[T]he Social Security Act 'is a remedial statute, to be broadly construed and liberally applied . . . .'").  Accordingly, I suggest that the ALJ erred by finding that Plaintiff's treatment during her emergency room visits constituted prescribed treatments.

However, this error was harmless because the record contains no evidence that Plaintiff experienced a "syncope" or a "near syncope."   20 C.F.R. Pt. 404, Subpt. P, App. 1, § 4.05.  Although "agencies are bound to follow their own regulations," federal courts will not remand a matter to an agency unless "the claimant has been prejudiced on the merits or deprived of substantial rights . . . ."  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647 (6th Cir. 2009) (quotation marks omitted) (first quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 545 (6th Cir. 2004); and then quoting *Connor v. United States Civil Serv. Comm'n*, 721 F.2d 1054, 1056 (6th Cir. 1983)).  In other words, the court will not remand if "the administrative agency would have made the same ultimate [conclusion] with the erroneous finding removed from the picture . . . ."  *Berryhill v. Shalala*, No. 92-5876, 1993

WL 361792, at *7, (6th Cir. Sept. 16, 1993) (quotation marks omitted) (quoting *Kurzon v. United States Postal Serv.*, 539 F.2d 788, 796 (1st Cir. 1976)).  This is to prevent "remand" from becoming "an idle and useless formality."  *See N.L.R.B. v. Wyman–Gordon Co.*, 394 U.S. 759, 766 n. 6 (1969)

Here, remand would be nothing more than a "useless formality" because Plaintiff cannot meet every element of the listing.  *See id.*  To meet listing 4.05, Plaintiff must satisfy each element of the listing.  *Sullivan*, 493 U.S. at 530.  But the listing does not just require that Plaintiff experiences episodes of arrythmia despite prescribed treatment, it requires that her arrythmia causes recurrent[5] and uncontrolled "episodes of cardiac syncope or near syncope."  *Id.* § 4.05.  Additionally, Plaintiff's arrythmias must be "documented by . . . medically acceptable testing, coincident with the occurrence of syncope or near syncope."  *Id.*  The regulations define a syncope as "a loss of consciousness" and a near syncope as "a period of altered consciousness," that "is not merely a feeling of light-headedness, momentary weakness, or dizziness."  *Id.* § 4.00(F)(3)(b).

Neither party identifies a single episode of cardiac syncope or near syncope, and although it is not the Court's role to comb the record for substantial evidence, the undersigned has reviewed the record thoroughly and failed to identify any instances where Plaintiff experienced a syncope or a near syncope.  *See Thomas v. Halter*, 131 F. Supp. 2d 942, 945 (E.D. Mich. 2001) (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir.

---

[5] A symptom is recurrent if, over a "consecutive [twelve]-month period," it occurs "at least three times, with intervening periods of improvement of improvement of sufficient duration that it is clear that separate events are involved."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 4.00(A)(3)(c).

1991)).[6]  Indeed, records from Plaintiff's numerous ER visits do not mention any loss of consciousness.  (*See* ECF No. 11, PageID.746–90.)  Instead, several of these documents state that Plaintiff only reported tachycardia and that she was "alert and oriented."  (*See, e.g.*, *id.* at PageID.746–49, 751, 754, 756, 759–60, 762, 764–65, 767–68.)  Moreover, Plaintiff's heart rate was abnormally high at only one of these visits.  (*Id.* at PageID.757.)  Plaintiff's records also contain reports on her loop recorder from January 2018 through July 2019, but while most of these reports show that Plaintiff was tachycardic, there is no evidence that Plaintiff experienced a syncope coincident her tachycardia.  (*Id.* at PageID.527, 531, 533, 574, 577, 580, 583, 585, 588, 592, 595, 597, 599, 601, 603.)  Unsurprisingly, then, given the lack of support from the record, the nonexamining state consultant did not discuss whether Plaintiff met or medically equaled listing 4.05.  (*Id.* at PageID.187.)  Accordingly, I suggest that the Court affirm the ALJ's decision because even if the ALJ corrected his error on remand, Plaintiff still could not meet every element of listing 4.05.

### H.  Conclusion

For the previously discussed reasons, I suggest that substantial evidence supports the Commissioner's denial of benefits, and I recommend that this Court **DENY** Plaintiff's

---

[6] The ALJ also neglected to discuss the lack of evidence that Plaintiff experienced a syncope, apparently believing that Plaintiff's successful emergency room treatments were reason enough to find that she did not meet listing 4.05.  (ECF No. 11, PageID.55.)  Although an ALJ's decision generally "must be affirmed on the grounds noted in the decision," the court need not reverse where the ALJ's error "clearly had no bearing on the procedure used or the substance of the decision reached."  *Berryhill*, 1993 WL 361792, at *7 (quotation marks omitted) (quoting *Kurzon*, 539 F.2d at 796).  Indeed, even if an ALJ's reasons for a finding are "unfounded," the court need only reverse where it "is in substantial doubt whether the administrative agency would have made the same ultimate finding with the erroneous finding removed from the picture . . . ."  *Id.*

motion, (ECF No. 13), **GRANT** Defendant's motion, (ECF No. 14), and affirm the decision.

### III. __REVIEW__

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1,"

"Response to Objection No. 2," etc. If the Court determines that any objections are without

merit, it may rule without awaiting the response.

Date: January 26, 2022                              S/ PATRICIA T. MORRIS
                                                    Patricia T. Morris
                                                    United States Magistrate Judge